Case number 23-1766 United States v. Dionte Fizer. Argument not to exceed 15 minutes per side. Ms. Shaw, you may proceed for the appellant. Thank you. Good morning and may it, or afternoon, excuse me, good afternoon and may it please the court. My name is Erin Shaw. I represent the United States and I'd like to reserve three minutes for rebuttal. Yes. After Dionte Fizer saw the emergency lights of the police car behind him, he spent the next few minutes making a lot of important decisions. He decided to defy police commands to give up his car keys and surrender. He decided to peel out and speed away. He decided to lead police on a high-speed chase through residential neighborhoods, sometimes going as fast as 80 miles an hour. And finally, he decided to toss his loaded gun onto somebody's front lawn to try to get rid of it before he was caught. The district court committed a reversible error in giving Fizer the benefit of the exclusionary rule in the face of those choices. The suppression order should be reversed. The district court's first point of error stems from its indifference about Fizer's decision to flee police in the high-speed chase. And this court's analysis on this issue should begin and end with Allen. Allen does two important things. First, it assumes police misconduct right out of the gate, and so it takes the question of the legality of the defendant's initial detention completely off the table. In other words, that's a point for the defendant. But what Allen does instead is it takes our focus on to what the defendant did and the defendant's actions. And if the defendant elects to go on a high-speed chase, he does not get the benefit of the exclusionary rule because the intervening circumstances of that chase sever the causal chain, and that flight is an intervening act that dissipates any taint that might have resulted from the initial detention. When we apply Allen here on the facts of our case, we assume that that initial stop in the parking lot evolved into an unlawful arrest, and we look at what Mr. Fizer did. Here, he began a high-speed chase that was an intervening act, and his tossed gun becomes admissible. And does the rule then in your estimation become that as soon as the new crime occurs, everything's off the table? You begin anew? That's exactly right. I have in my notes it's a reset button, so I think we're on the same page on that point. I think the minute that he peeled out, he gave up any right to application of the exclusionary rule, and that nothing in the parking lot mattered anymore. Does it matter that he tossed his gun in Allen? The gun was recovered under, or does it matter that the gun was tossed along the way? To me, I think it's almost a better fact, because it gives us a second ground for it. You know, by abandoning the gun, he's saying, I'm just claiming ownership of this gun. So we've got the first step is the attenuation through the flight, and then the second step would be the abandonment. And that's a lot like Castillo. That's unpublished, but it's the same fact pattern where the guy takes off in the car, and then he tosses his money and drugs out of the car. So I think they both fit. Is the motivation of law enforcement in conducting the original arrest matter? I don't think it does, and I think looking at the motivations here, I think the concern perhaps is that they drew their guns, and that's certainly where I think the district court was concerned. But Mr. Fizer has raised that issue, and I think here the fact that they drew their guns doesn't change the analysis, because they had reasonable suspicion that he was armed and was an armed drug dealer, so they had concerns about their own safety. So the use of weapons, I think, in this situation was not something that would be concerning or to change the analysis. Are there any additional questions on the abandonment issue? If not, I'll move on to my next point. No? Judge Ciancio, I want to give you a second. Move on. We can come back to it if we need to. Thank you so much. My next point has to do with the Fourth Amendment, and there was no violation of the Fourth Amendment, even without the Allen argument, because we have no arrest, and even if there was an arrest, there was probable cause to support that arrest. So I'll begin with my argument that there was no arrest here. The district court erred as a matter of law in holding that this valid investigatory staff escalated into an illegal arrest. The factors that this court considers in determining whether there was an escalation are whether the detainee was transported to another location, whether there were significant restraints on his freedom of movement that prevented him from leaving, and whether there was a use of weapons or bodily force. Isn't it kind of a bad fact for you that one of the officers told Mr. Fizer you are under arrest? It is not a great fact, but I think I have an answer for you on that. When we consider whether or not someone was under arrest, there's either physical force or there's got to be a show of authority with submission. So I would say that those words are a show of authority, certainly, and then we have to look at, again, it's kind of like, we say that, and we say, let's look over here. What did the detainee do in response to that show of authority? And here, he peels out and drives away. So he never submitted to those words, and so I think, while it's something to consider, I think we But what does he do? And so he takes off. So I would say, when they tried to assert that authority, he did not submit himself to it. So he's not arrested. Am I wrong? It was certainly an attempted arrest, was it not? I mean, after all, they pointed guns at him. They were getting the shield to approach him. He certainly didn't feel free to leave. Well, I don't know. He did leave. I think it was a Terry stop. I view it as a Terry stop. It started as, I think, it started out that they're just trying to stop him and talk to him, and then, along the way, they asked him to give up his keys eight times before they said, you're under arrest. So I think, through the time that they're having together in this parking lot, in the beginning, they tell him to pull over, and he drives around the front of the store. He passes, I think, six or so parking spaces where he's got a spot to stop, and he just keeps going. Then they finally tell him, stop the car. They draw their weapons because they've been told by the DEA agent that he's an armed narcotics dealer, and they know that he has a felony, so he's not allowed to have a gun. But I don't think that show of authority, or excuse me, that show of force under these factors is one of the things we consider, but that doesn't take a Terry stop and turn it into an arrest. I mean, Heath and Harnett both show us that a use of force is allowed if the police think that the person that they're dealing with is armed, and here they did. So I don't know necessarily that it was an attempted arrest. I would say it was a Terry stop that they're trying to accomplish and just investigate what's going on here. But even if it was an attempted arrest, I don't think they ever completed that. I don't know that I could say for sure what an attempted arrest is. We look at the show of authority, and we look at the defendant's response, or the person's response, and here we have, you know, he blows off every thing that they say after, stop the car, and never surrenders the keys. Is there a gap, a time lag between the time that he's told you're under arrest and the time he takes off? It's about 15 seconds. It's pretty quick. What if it had been 10 minutes? So he submits for 10 minutes, and then he changes his mind and barrels off. Would that change our analysis at all? Well, I think it's how long do they sit there and kind of wait for him to respond to that you're under arrest. But maybe we don't need to answer that because it's 15 seconds. I don't know that we do. I think he's still kind of deciding what am I going to do with, you know, it's not this, but he's deciding what to do, and then he takes off really quickly after that. If Fizer had not fled in response to the officer yelling, you're under arrest, would you concede that he had been arrested? No, I don't think he was arrested. You don't think he was? No, I don't think he was arrested at all. I think, I agree that he was he was seized in the parking lot in the first instance when they said stop the car and he stopped. I think he was seized, but I don't think he ever, I don't think he was ever arrested, and the district court's view that it escalated, I would say no, it did not. That's a pretty fine distinction between being seized and yet not arrested. Aren't they much less the same thing? Well, no, I don't think so because anytime you're pulled over and you stop, you're seized. I mean, speeding, any type of interaction with the police, you're seized, and I think arrest is different because that's not a temporary seizure. An arrest is more permanent, and that deals with, are you now going to be in the custody of the police because you've committed a crime? So a seizure, I think, typically is a shorter duration, but an arrest is much more permanent, and so here I don't think that he was ever under arrest because they never had him under their custody and control, and back to the fact... And it matters, the reason that matters is because of the level of suspicion that's required, reasonable suspicion versus probable cause. Well, the reason that matters is because when you're looking at what are the factors, then you consider whether a Terry stop escalates into an arrest, you're looking at was he transported somewhere else, was his freedom of movement detained, or did they use weapons? So I think it matters because... Right, but the reason the district court found that... The district court thought there was an arrest without probable cause, and so that's why it matters whether he was merely seized in a Terry stop fashion versus being arrested. Is that because of the level of suspicion? Correct. There was a valid Terry stop here, and the district court, I think, erred in saying it escalated into an arrest, and also that he thought it was an arrest without probable cause, which I can turn to the probable cause issues too if that's helpful, or if you don't have any additional questions on the arrest point. That would be fine with me. Thank you. So probable cause is a standard that is not a high bar, and I think that's the important lens to look at the facts of this case through when determining whether or not there's probable cause to arrest here. It requires only a probability or a substantial chance of arrestable activity and not an actual showing, and we look at what a prudent man would think about the circumstances and whether or not the arrestee had committed or was committing an arrestable offense. So here, we look at all the facts that we have from the time that the DE agent got the tip from the informant all the way up through the short stops along the way, and I think if you talk to a reasonable person, the prudent man, my next door neighbor is the example I like to use, and said, hey, what do you think this guy was doing that day? Do you think that he was dealing drugs? And they say, well, I think there's a substantial chance of that. I think you've got probable cause. And if you would say, hey, do you think he was someone who was a prohibited person who had a gun? Yeah, I think that's a fair probability that he had a gun. Then you have probable cause. So I think the wanted us to disprove things about the innocent explanations, and he wanted to know more about the informant, and that's just not what we have to do here. You can look at just the facts as they stand and see whether or not it seems like there's a fair probability that criminal activity was going on here, and I think we've gone through all the different facts that show that they had not only reasonable suspicion but probable cause that he was not only dealing drugs that day but was a prohibited person who had a firearm, and I see I have four seconds. Let me just ask, if Agent Joyner's subjective belief that there was probable cause to arrest, did his instruction to the arresting officers to find their own probable cause sever that collective knowledge? See what I'm asking? He's saying, okay, I think we have probable cause, but his instruction to them is, you go find probable cause. Well, I think he wants it all, right? He wants to have his own, and I think he's saying, I'd like some more, so why don't you do your own? Do you rely on yours also? I think it's not, mine's not good enough, I need yours, it's let's have as much as we can. So I don't view that as a sever, and what I have isn't good enough, get your own. I think it's that he conveys to them, I've got probable cause that this guy's an armed drug dealer, and he's a get your own, because it's always nice to have more, but I don't think he's saying what I have isn't good enough. I need you to bail us out here at all. I'm over time, are there any additional questions? Thank you. I'll see you in a few minutes. Thank you. Good afternoon, your honors. My name is Stephen Shark, and I represent Mr. Fizer. I'm going back to the date of this incident back in July 28th of 2020. We've had testimony that a DEA officer received information from a TIP informant that Mr. Fizer was going to be in the area of Flanders Street in the city of Detroit. This informant told the officer, the DEA officer, that Mr. Fizer would be having, usually carries a weapon on him, and that he was going to this location to purchase drugs. Unfortunately, at the evidentiary hearing that was presented before Judge Gray, there was no testimony. We had no evidence showing what the relationship was between this informant and Mr. Fizer. The reason why that's important is because we don't know the reliability of this informant, how much information he actually had about Mr. Fizer. But doesn't the record show that they investigated? Yes. They look at him on a website, have him picked out from photographs, confirming this particular claim reliable? Correct. Well, what they did is, from the evidentiary hearing, is they pulled up his Instagram picture. It showed a picture of Mr. Fizer, which the officer then pulled up his secretary of state driver's license information, which confirmed that that was him. But what actually did this agent know, other than the fact that what this informant is telling him, we don't know when the last time they spoke, when was the last time they had any dealings with this informant before, to indicate whether Mr. Fizer ... Is there an allegation of reliability in this case, a reliable informant? Remind me, I'm not sure. There was really not ... I don't believe there was enough to show that this informant was that reliable to indicate what Mr. Fizer ... The allegation was made that a reliable informant ... Yes. ... told us the following. Correct. And we followed up on it in these particular ways. Yes. And so what happens after that is the DEA sets up surveillance, waiting to see if Mr. Fizer is going to appear at the Slander Street address. We heard the testimony of Agent Joyner saying that at the time that they're on surveillance, they see a car fitting the description of Mr. Fizer in the vehicle or something of that nature. And Mr. Fizer never stops at that location. He continues past the location. On cross-examination, I believe when Mr. Fizer testified, he said the reason why he didn't stop there is because he didn't see any vehicles there that he knew, because that's a studio where they record rap music. And as the agent indicated, the house was a dope house as well. But Mr. Fizer never even stopped there. They never saw him get out of his vehicle. He continued. He ended up at a gas station in the close proximity to the studio. They said they observed him in this parking lot on the cell phone, doing nothing illegal. He then proceeds from that area of the gas station to another city, and it's called Inkster, Michigan, which is approximately, I would say, 20 minutes from Detroit. And at that point, he's just driving normal. The officer, what Agent Joyner wants us to believe is that because he had tinder windows and that he was texting on his phone, that was a civil infraction. And that was grounds to have him pulled over on a traffic stop. So what Agent Joyner then does is he contacts the state police officers in the near proximity to where he was at, and he asked him to stop this vehicle. And he tells, the evidence shows, is that he told the troopers that Mr. Fizer will be, carries a weapon, and that he's known to purchase narcotics in the past. And I guess he's giving them a heads up information to give them a warning that when you make this traffic stop, maybe this person may have a weapon. Because at that point, they've never seen a weapon. At the time that Agent Joyner calls the troopers, he's never seen any drug transactions. Where do the six stops come in with someone entering his car for approximately 36? The classic sale of drugs. Classic as can be. And the difference is, is that this investigation, this surveillance went on for three hours. From the time that Mr. Fizer came down Flanders Street to the time that the state police pulled him over was approximately three hours. Between the time he left Flanders Street and the gas station on the way to Inkster, he made six stops as they indicated. On prior dealings, Sergeant Joyner, Agent Joyner indicated that when they did those kind of hand-to-hand allegedly buys at the Flanders from going to Flanders, they would stop the individuals to see if they had narcotics. And that's how they knew that they were selling drugs out of the Flanders Street address. Agent Joyner testified that while they were doing surveillance at this Flanders house after this stop of Mr. Fizer, that they would stop the individuals who left the Flanders Street address to see if they purchased drugs, which they did. In this case, the people that they said Mr. Fizer stopped to meet with, those individuals were never stopped. And don't forget they had surveillance of him. So they had officers available to stop these individuals to verify whether a hand-to-hand was actually made. And it was never done. Well, do the six stops that fit all of the general standards of sales of drugs not have an influence in the case? It would. It would. But I would say that you could really determine. I mean, Agent Joyner did say that even while they were on surveillance and watching the six individuals, he never was able to see anyone leaning down, like making gestures as if he's trying to hand something to them. He just said that they saw him meeting in the vehicle for short periods of time and they would leave. That's not enough for reasonable suspicion. It could be. I'm not saying it can't. It could be. I would say. But at the point then as they proceed to Inkster and as the officers are all trailing Mr. Fizer in his vehicle, is when the agent has the state troopers pull him over. And the question was asked even by Judge Gray was why, basically, why if you had reasonable suspicion back at the time that you saw these six hand-to-hands, why didn't you stop them then? And then the question also becomes to Agent Joyner, why wait three hours later? And but why also, why would you say you didn't have the probable cause to stop him and had the state police stop him? Find your own probable cause is what he told the state police, meaning he didn't have it. Counsel tells you it's belts and suspenders. Yes. You want both? Yes. But in this case, though, he didn't believe he indicated on cross-examination at the evidentiary hearing that Sergeant Joyner did indicate that he didn't observe Mr. Fizer do anything illegal from the time that he appeared on Flanders Street to the time that he was stopped by the state police. And that was in the transcript. But that seems to require, I mean, if he had seen an actual hand-to-hand transaction, then he'd have probable cause or, you know, if he had testified to that in court, I mean, maybe that he'd have enough to prove the case. Maybe not by beyond a reasonable doubt, but if we were in a preponderant standard. So you seem to be demanding more than reasonable suspicion. Yeah. Well, I'm trying to show that at the time that they stopped the vehicle, the state police, if they were there for a traffic stop, when was the last time on a traffic stop you would see, as Mr. Fizer indicated, it appeared that there was a funeral line, as many police cars that were there. When was the last time that we've seen on a traffic stop, numerous officers getting out with guns pointed at an individual who's sitting in a car with holding their badges in protection that they're going to be shot at. Now, at this traffic stop, there, he was stopped. And I disagree with counsel because I believe that in the transcript, it indicated that he was sitting in his car for over two minutes. And during this two-minute time, period of time where the police were trying to approach him, he had his hand out. He was told, you're under arrest. He had his hand out the window with a cell phone in his hand, speaking to his mother, letting her know that I think I'm going to leave. He was in danger of his life. He was told to throw out his keys. Yes. He didn't do it. He did not. His engine was off. And at the point when they're approaching him with the weapons and telling him that he was under arrest, and he's asking why, and they won't give a response, he started his car and he left. Here's the problem. They come together in this frightening display. I don't dispute that. But your argument is that, or appears to me to be, that he then had a right to engage in flight. And it's not because of his fearfulness. And that prevents it from being a distinct crime that begins a new ability to consider that crime. Correct. How does that work in a Fourth Amendment analysis? Well, it is our position, and I agree with how Judge Gray's analysis was, is that at the time that he's actually stopped. So he's in his car. He stopped. He turned his engine off. He was told he was under arrest. So he's not free to leave. At that point, pursuant to the exclusionary rule, anything that occurs after the time that they illegally arrested him, because at that point he hasn't done anything criminally wrong other than violating a civil infraction. But there is an attenuation doctrine, right? And that's what we're talking about when we talk about the Allen case. Yes. So how do you distinguish Allen from this case? I distinguish Allen from this case because it is my position that as a result of an illegal arrest, that it shouldn't even go farther than what Allen is saying. It should stop right at the point where he was detained illegally, arrested illegally, and anything after that period of time should not matter. Right. But that's not what happened in Allen. So Allen is a published decision of our court applying the attenuation doctrine. So in Allen, they conceded that the prior arrest was illegal, but then the guy takes off and then they find the drugs in his car. So how is that different than this case? I mean, in this case, he threw the gun out the window, allegedly because nobody, don't forget the police were following him during this chase at this high rate of speed. Not one officer observed him tossing anything out the window. So it wasn't until later on after he's arrested that the police go back to the scene with a dog and they find this weapon on someone's property. Yeah. Do we have some kind of a factual finding that it wasn't his gun? Um, they took fingerprints, but we never heard what the result that the agent never informed us at the evidentiary hearing, what the results were. Did you contest? Did you say, well, that's not my gun. Even if all of this is true, that's not my gun. He, uh, Mr. Fizer did testify and he, he stated that, um, at the hearing, if I'm not mistaken, that he never admitted to the gun being his, um, on the stand. And, um, I know the people whose house that the gun was found in front of, they denied that they ever seen that gun before. Um, but he never, Mr. Fizer never admitted to having that weapon at the evidentiary hearing. Our Castillo case addresses that and it talks about the problem here is that, um, that it would immunize defendants from prosecution for all crimes that are committed that follow police misconduct. And I think what Alan is saying is you, there may be the crimes that follow may be separately and independently, uh, cases that the, that the police can bring because there's a cutoff from prior police misconduct. So how does this help us with the purposes of the exclusionary rule? If we accept your idea that the fear enabled him to drive away and that it, it then still cut off any, um, prosecution for anything that occurred. See, I, in, in my reasoning or my, my thought process is that once, um, it's a different situation in this case because in majority of the cases that we read in the prior cases, case law, um, the drivers of the vehicle actually didn't, there wasn't a time, time-lapse. In other words, is in this case, Mr. Fizer was sitting there for over two minutes. In a lot of those other cases, the individuals just got up and ran or there wasn't a long period of time. And you consider the two minutes while the officers are trying to convince him to stop? Well, there was two minutes. It was, it was actually more than that. It was two minutes from the time that he was stopped. And from the time the officers came out of their vehicles with their guns and, um, shields, um, I believe that Allen would have applied if Mr. Fizer would have taken off immediately and not waited two minutes. If he just would never turn his car off, he would have stopped. His car was still running and then proceeded on this chase. I would believe that's the case that I would say that Allen would apply to. But in the case such as this one, where there was a time factor where he was actually in his car. I'm sorry? What's your best case for a two-minute time factor making the distinction? Uh, best case meaning? Yeah, that best case that would, would enable you to make this argument. Because Allen seems in general to cover this activity. Yeah, I just, I just think that the, um, the fact that he, the fact that he was actually under arrest and sitting there for that period of time differentiates. If we determined that it was not an arrest, what happens? If, if he wasn't arrested? We determined that it was not an arrest, that yes, one officer, but your opposing counsel says it wasn't an arrest. Right, right. So let's, let's assume we agree that it wasn't counsel. It wasn't an arrest. So what happens? Well, if he wasn't under arrest, then what he did was it, they wouldn't have had a right to suppress the evidence if he wasn't under arrest. But my time is up. If you have any other questions. Thank you. Thank you so much. Appreciate it. Thank you. I'd like to just, uh, speak briefly to the timeline of events in the, in the parking lot. Um, the police told him to stop the car when he kept driving. He drove for about 15 or so seconds and then he kept driving past several places where he could have stopped and he went around to the side of that building there. They tell him to open the door, turn off the car, throw the keys. He opens the window, he closes the window. They tell him to throw the I think it's eight times before they get to the point in the timeline. They tell him he's under arrest. They don't tell him he's under arrest until they're close to two minutes into this exchange. So it doesn't happen in the beginning. The situation is evolving and they say, stop the car. And he, you know, he does stop the car, but then, you know, we, we refer to it in our brief as this kind of standoff where he's deciding what to do. And so he opens the window and he's kind of, you know, talking and then he shuts the window and they say, open the door and throw the keys and then he gets his phone out and he's kind of, you know, I think even counsel admitted he calls his mom and he says, I'm going to flee. So he's, he thinks he's going to, at that point he's deciding he's going to take off. So he's making a lot of decisions along the way in this, in this parking lot. And they don't even say this, you know, phrase we've talked about, you're under arrest. That happens at the very end after he has defied every command to give up the keys that, you know, and I'm sure you'll go back and watch the video again, but it doesn't happen until about two minutes into this situation. And then the next thing he does, I think he asked him one more question and then he starts the car back up and he peels out. So the suggestion that it happened, you know, right away, that was the first thing they did. That's not true. They did have their guns drawn. And I've talked about that already, that the reason that they did is because they thought he was armed and they were concerned for their own safety. But it's important to note too, that they hung back and they talked to him over the PA because they didn't want to get up and they didn't want to get too close because they were concerned again for their own safety. So they were hanging way back and they didn't, you know, approach the car or, you know, pull him out or block him in or do any of these types of aggressive movements around him. You know, they were hanging back for safety. It was fairly aggressive with a whole quadrant of officers and shields. I mean, that would decidedly catch the attention of someone sitting in a car. Well, they didn't go and get the shield until they had asked him, I think, eight times to give up his keys. And then I think the one guy says, I'm going to go grab a shield. So at that point, I think the situation is, what are we going to do with this guy? He's not listening to us. We might have to, you know, take the next step. But at that point they hadn't. They were, you know, figuring what to do in the moment. And so that's, I think that I just want to clarify the situation there. And I know it's easy to just turn the video on and watch it again, but that's what happened. And under your view, we don't need to go any further, right? You think under Allen, that's the end of the ball game. I do. And I disagree with something that Mr. Sherk had said when he said, you know, if it's illegal, that's the whole point of Allen is you take that off the table. And I give him that point. Let's assume it was illegal. Fine. You look at the next step and what does this defendant do in response? And if what he does is lead police on a high speed chase, that breaks the causal chain attenuation. And I think at that point, the evidence should not be suppressed. And which is what I'm asking for here, obviously, is to ask this court to reverse the expression order of the district court. Thank you. Thank you. We appreciate your briefing and your arguments. It's helpful to us. The case will be taken under advisement and an opinion issued in due course.